Filed 11/8/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JOSIAH T., a Person Coming Under the Juvenile Court Law. | B311213 |
| | (Los Angeles County Super. Ct. No. 17CCJP00277D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|     Plaintiff and Respondent, | |
|     v. | |
| E.M. | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Kristen Byrdsong, Judge Pro Tempore. Conditionally reversed and remanded with directions.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————————

E.M.'s parental rights as to her son Josiah T. were terminated pursuant to section 366.26 of the Welfare and Institutions Code.[1] We conditionally reverse the termination order because the record does not demonstrate that the Department of Children and Family Services (DCFS) fulfilled its duties under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) or provided information necessary to the juvenile court to make findings as to the applicability of ICWA.

## FACTUAL AND PROCEDURAL BACKGROUND

I.    *Dependency Proceedings*

Around 2014, Mother and Jeremiah T. (Father) began dating. As of July 2017, Mother and Father had one child together and Mother was expecting a second child; she also had custody of two of her children from prior relationships. The relationship was marked by severe domestic violence, including an incident in July 2017 in which Father broke into Mother's apartment while Mother and her children were home sleeping. Mother awoke to Father choking her. Father whipped Mother with a leather belt and hit her repeatedly, at one point striking her abdomen and telling her he was going to cause her to miscarry. After Mother escaped with the children, Father texted Mother that he would "make sure you [have a] miscarriage." Father was arrested for domestic violence and making criminal threats.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

Although Mother said Father did not live with her, police officers noticed a number of containers in the apartment that appeared to contain Father's clothes. When DCFS investigated, it appeared Mother continued to maintain an intermittent relationship with Father despite the domestic violence. Mother acknowledged a restraining order protecting her from Father, but she began to see Father again and violated the restraining order because she felt he was "doing better." Mother said Father had a drinking problem; she claimed she had ended their relationship when he began drinking again.

In September 2017, shortly before Josiah T.'s birth, DCFS filed a juvenile dependency petition under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (j) (sibling abuse) as to the three children in Mother's care. The petition alleged domestic violence, Mother's prior medical neglect of an older child no longer in her custody, and Father's alcohol abuse. Mother secured permission from the juvenile court to move to Las Vegas with her children by providing a falsified lease agreement to the court. DCFS later discovered the family had not left Southern California. Social workers in Las Vegas were unable to locate or make contact with Mother. Mother missed scheduled appointments with DCFS and lied to DCFS about her whereabouts, the children's location, and even Josiah T.'s date of birth.

Josiah T. was born in October 2017 at a time when DCFS was unable to locate and assess any of the children. DCFS filed a dependency petition under section 300, subdivisions (a), (b), and (j) for Josiah T. shortly after his birth. The juvenile court ordered Josiah T. detained and issued both a protective custody warrant for him and an arrest warrant for Mother. Eventually

DCFS learned Mother and Father were in Arizona with the children. In November 2017, the children were recovered from the parents and placed in foster care.

On November 29, 2017, the court sustained multiple allegations of the dependency petitions, declared Josiah T. and his three older siblings dependents of the juvenile court, and removed them from parental custody.

Father never participated in the dependency proceedings and refused to communicate with DCFS despite DCFS's repeated efforts to contact him. On September 26, 2018, Father's reunification services were terminated. Mother participated in reunification services and visited with her children, but she remained in a relationship with Father, attempted to conceal their ongoing contact from DCFS, bore another child and lied to DCFS by saying the baby was not hers, and failed to demonstrate an ability to protect her children. On July 24, 2019, Mother's reunification services were terminated. Mother and Father's parental rights with respect to Josiah T. were terminated on February 24, 2021. By then, over three years had passed since DCFS filed its first petition. Mother appeals.

## II. *The ICWA Inquiry*

### A. September 2017: Before Josiah T.'s Birth

Shortly before Josiah T. was born, Mother appeared in juvenile court in conjunction with the September 2017 petition concerning the three older children. Mother completed a form stating she had no American Indian ancestry. On September 14, 2017, the juvenile court found it had no reason to know ICWA applied to Josiah T.'s siblings with respect to Mother.

4

Father appeared at the arraignment hearing on the older children's petition on September 22, 2017. He provided paternal grandmother's address as his permanent mailing address. The record provided to this court does not state whether the juvenile court inquired of Father whether he knew or had reason to know his first son was an Indian child, as required by section 224.2, subdivision (c).

B.     October and November 2017: ICWA Findings for Mother, No Contact with Father

1.     Initial Investigation, Detention Report, and Hearing

DCFS began searching for the family in early October 2017 when Mother's communication became sporadic and Las Vegas social workers were unsuccessful in locating the family. As part of the investigation, DCFS visited paternal grandmother's home because Father had provided her address as his mailing address. Other DCFS records also associated him with that address, and Mother had confirmed the address as paternal grandmother's residence. No one answered the door.

The detention hearing for Josiah T. was set for October 18, 2017, during the time period when the family's location was unknown. In the detention report for Josiah T. filed by DCFS on October 17, 2017, DCFS stated it was unknown whether ICWA applied. DCFS advised the court of the ICWA finding with respect to Mother in the proceeding involving the older children, and noted that "DCFS has not met with the child's father. It is unknown if the father has any American Indian ancestry."

Neither parent appeared at the detention hearing. The record includes an unsigned ICWA-020 form bearing the date of

5

the detention hearing and stating Mother had no Indian ancestry. The minute order from the October 18, 2017 detention hearing states that the court found there was no reason to know Josiah T. was an Indian child with respect to Mother, but the reporter's transcript from the hearing contains no mention of ICWA.

## 2. Jurisdiction/Disposition Report and Hearing

On October 20, 2017, DCFS returned to the home of the paternal grandmother, where paternal uncle T.T. identified himself as Father's brother and denied Mother or the children were at the residence.

On November 1, 2017, DCFS filed a jurisdiction/disposition report. DCFS again reported that the investigating social worker "has not yet met with the child's father. It is unknown if the father has any American Indian ancestry." Father did not appear at the November 29, 2017 jurisdiction/disposition hearing.

## C. December 2017–May 2018: Family Contacts but No ICWA Inquiries During First Period of Services

On December 5, 2017, Mother told DCFS she would like her two children with Father, Josiah T. and his older sibling, to be placed with paternal grandmother. DCFS spoke with paternal grandmother on December 11, 2017. Paternal grandmother expressed an interest in visiting with Josiah T. and his brother and receiving the two children into her care. The social worker advised paternal grandmother she had to come to court to request visitation and gave her the date of the next hearing. She also informed paternal grandmother that her home would need approval before the children could be placed with her. The social worker's notes stated she would follow up with paternal

grandmother about the approval process.  The notes do not reflect that DCFS asked paternal grandmother whether Josiah T. is or may be an Indian child.

The following week, the social worker and paternal grandmother spoke again about the caregiver approval process. Paternal grandmother continued to express interest in caring for Father's two children with Mother.  The social worker told paternal grandmother she would need to meet with all the adults in the home and any other adults who would have significant contact with the children, and that an authorization for release of information would have to be signed by all adults living in the home.  The social worker scheduled a meeting with paternal grandmother and paternal uncle T.T.  It does not appear from the record that the social worker made an ICWA inquiry during this conversation.

On December 21, 2017, DCFS advised paternal grandmother it would be unable to place the children with her because of her multiple arrests, including a recent one for driving under the influence.  The social worker asked paternal grandmother to share the social worker's contact information with other family members who might want to care for the children.  There is no indication in the record that DCFS inquired whether Josiah T. is or might be an Indian child during this telephone call, now the fourth contact with paternal grandmother/paternal uncle where the ICWA issue was not raised and resolved.

DCFS spoke with paternal grandfather on April 5, 2018. Paternal grandfather did not know about the dependency proceedings and denied contact with Father or paternal grandmother.  From the record on appeal, it does not appear the

social worker asked paternal grandfather whether Josiah T. is or may be an Indian child.

On May 16, 2018, two DCFS workers visited paternal grandmother at her home and spoke to her about Father. Paternal grandmother said Father "comes and goes" at the home and she saw him once or twice per month. She confirmed Father received mail at her address and she accepted documents for Father. The record does not reflect any inquiry into Indian ancestry for Josiah T. at this time.

In the status review report it submitted to the juvenile court on May 30, 2018, for Josiah T.'s section 366.21, subdivision (e) six-month review hearing, DCFS told the juvenile court ICWA did not apply. DCFS did not explain how it reached this conclusion given that, as it also told the court, the social worker "has been unable to meet with the . . . father, as his whereabouts remain unknown. It is unknown if the father has any American Indian ancestry." DCFS did not report any inquiries into whether Josiah T. is an Indian child.

> D.     June 2018–November 2018:  Family Contacts and No ICWA Inquiries During Second Period of Services

At least by July 2018, DCFS had learned Josiah T. had a paternal aunt, as she is mentioned in a report prepared at that time.

The section 366.21, subdivision (f) 12-month review hearing was scheduled for November 29, 2018, and DCFS submitted a status review report to the juvenile court on November 21, 2018. Again, DCFS asserted it did not know whether Father had Indian ancestry, but declared ICWA did not apply. DCFS repeated its prior statement that the social worker "has been unable to meet with . . . father, as his whereabouts remain unknown. It is

unknown if the father has any American Indian ancestry." DCFS did not describe any investigation concerning Josiah T.'s possible Indian ancestry during this period.

E. December 2018–April 2019: Family Contacts and ICWA Inquiries During Third Period of Services

The section 366.22 18-month permanency review hearing was set for April 18, 2019. On April 15, 2019, DCFS submitted a status review report to the juvenile court. In this report, DCFS once again advised the court that ICWA did not apply even though the social worker had not met with Father, did not know where he was, and did not know if he had any American Indian ancestry. DCFS advised the court that the social worker "will contact the paternal grandmother, Ms. Natasha W[.] to inquire about possible American Indian ancestry. [The social worker] will submit an LMI [last minute information] with an update." Despite the dearth of information about Father's possible American Indian ancestry, DCFS recommended the court "make an ICWA finding" as to Father.

On the same date the report was filed, April 15, 2019, DCFS for the first time asked paternal grandmother about Indian ancestry. According to a report DCFS *made the following year*, in that conversation paternal grandmother told the social worker that "there is Cherokee Indian Ancestry on her grandmother's side. However, [paternal grandmother] denied having any further information in regard[] to ICWA." She declined to provide information regarding her grandmother.

Although DCFS had promised to file a last minute information report with any information received from paternal grandmother, and DCFS did receive this information in advance of the scheduled April 18, 2019 review hearing, there is no last

9

minute information report in the record. There is also no indication in the record that DCFS followed up on paternal grandmother's report of Cherokee ancestry with any further investigation or inquiry.

The 18-month review hearing was continued to June 4, 2019.

F.      May 2019:  No ICWA Inquiry, No Disclosure of Paternal Grandmother's April 2019 Report of Cherokee Ancestry

In advance of the June 4, 2019 18-month review hearing, DCFS submitted an extensive last minute information report on May 28, 2019. In this report, DCFS did not disclose to the court that paternal grandmother had informed DCFS one month earlier in April 2019 that she had Cherokee ancestry, nor did it identify any ICWA inquiries made. Although DCFS spoke with paternal grandmother again in May 2019, there is no indication that DCFS asked her for the relevant family member information for ICWA inquiries with the tribes and the Bureau of Indian Affairs. DCFS renewed its request that the court make an ICWA finding as to Father.

On June 4, 2019, the juvenile court again continued the 18-month review hearing, this time to July 2, 2019.

G.      June 2019:  No ICWA Inquiry, No Disclosure of Paternal Grandmother's Report of Cherokee Ancestry

DCFS submitted a multi-page last minute information report to the court in advance of the July 2, 2019 hearing date. Once again, DCFS did not inform the court paternal grandmother had stated she had Cherokee ancestry. DCFS did not include any information suggesting any further inquiry had been made with

10

respect to ICWA, and it does not appear from the record that DCFS took any action to gather further information about paternal grandmother's report of Cherokee ancestry or to contact the Bureau of Indian Affairs or Cherokee tribes. DCFS nonetheless asked the court to make an ICWA finding concerning Father.

On July 2, 2019, the court continued the 18-month review hearing once more, to July 24, 2019.

### H. July 2019: No ICWA Inquiry, No Disclosure of Paternal Grandmother's Report of Cherokee Ancestry

There is no mention in the record of DCFS taking any action during this time period to further inquire after paternal grandmother disclosed her Cherokee ancestry.

DCFS did not submit a last minute information report to the court in advance of the rescheduled 18-month review hearing. Nor did DCFS did advise the juvenile court at the hearing about the information it had received from paternal grandmother three months earlier. At the July 24, 2019 review hearing, the juvenile court terminated Mother's reunification services and set a section 366.26 permanency planning hearing for November 20, 2019.

### I. August 2019–November 2019: Conversation with Paternal Grandmother, No Disclosure of Her Report of Cherokee Ancestry

In October 2019, the caregiver for Josiah T. and his brother advised DCFS she was no longer able to adopt them. A DCFS social worker contacted paternal aunt who was interested in adopting the children, and the formal process for evaluation soon began.

With the permanency planning hearing approaching, DCFS wanted the court to find ICWA inapplicable so the children could be adopted. On November 6, 2019, paternal grandmother was contacted by a different DCFS social worker than the one she had told of her Cherokee ancestry in April 2019. Paternal grandmother denied Indian ancestry to the new social worker. Because DCFS had not yet reported paternal grandmother's April 2019 statement to the juvenile court nor documented it in the then-existing records provided to the juvenile court, the new social worker inquiring in November 2019 may not have been aware that paternal grandmother had changed her story; in any event, there is no indication that anyone from DCFS asked paternal grandmother about the change in her statement, nor is any detail about the nature of this social worker's inquiry included in the record on appeal.

DCFS also spoke with paternal aunt, who told DCFS she believed her father possibly had Indian ancestry. Paternal aunt telephoned paternal grandfather, who advised he had Choctaw ancestry through his grandmother and great-grandmother. Paternal grandfather provided names of his parents and one birth date, and paternal aunt agreed to call DCFS if she was able to obtain more information, which she later did. There is no indication in the record that DCFS asked paternal aunt whether she had any Indian ancestry through paternal grandmother or sought biographical information about paternal grandmother's side of the family.

Although DCFS had received this information about possible Choctaw ancestry before it submitted its section 366.26 report, DCFS had not inquired with the three Choctaw tribes or the Bureau of Indian Affairs whether Josiah T. is an Indian child.

DCFS told the juvenile court it would send ICWA notices to the tribes and the Bureau of Indian Affairs once a new section 366.26 hearing date was set.

Despite DCFS's failure to complete its ICWA inquiries, DCFS pressed the juvenile court for an ICWA finding so the children could be adopted. In DCFS's section 366.26 report, filed November 8, 2019, the adoption social worker "recommend[ed] that the Court find that ICWA does not apply to the father as an ICWA finding is needed to proceed with the adoption process." DCFS again asserted ICWA did not apply. Although the report purported to summarize DCFS's ICWA inquiries, DCFS failed yet again to disclose to the juvenile court that paternal grandmother had told DCFS months earlier that she had Cherokee ancestry. DCFS informed the juvenile court only that when it spoke to paternal grandmother on November 6, 2019, she denied Indian ancestry.

The section 366.26 permanency planning hearing was continued to March 18, 2020.

J.    January 2020: First Disclosure of Paternal Grandmother's Report of Cherokee Ancestry

On January 10, 2020, in a status review report for a section 366.3 permanent planning review hearing, DCFS advised the court for the first time that paternal grandmother had stated she had Cherokee ancestry in April 2019. DCFS did not describe making any further inquiries into Josiah T.'s possible Cherokee ancestry in response to this disclosure: DCFS merely reported that paternal grandmother later said she had no Indian ancestry. DCFS did not acknowledge the contradiction or describe any further inquiry when paternal grandmother contradicted her prior report. Nor did DCFS report ever asking paternal aunt,

13

paternal uncle, or paternal grandfather about either of paternal grandmother's contradictory statements, or for the names, birthdates, and other necessary information about paternal grandmother's parents.

DCFS again advised the court about the information suggesting possible Choctaw ancestry through paternal grandfather. DCFS did not describe any additional inquiries into Josiah T.'s possible Choctaw ancestry, and it had not contacted the tribes or the Bureau of Indian Affairs to inquire whether Josiah T. was a Choctaw child. DCFS stated it would give notice to those tribes and the Bureau of Indian Affairs when a new date was set for the permanency planning hearing.

K.      January 2020–January 2021:  Remaining Reports

In late January 2020, paternal aunt and paternal grandfather provided additional information regarding Josiah T.'s possible Choctaw ancestry, including paternal grandfather's belief that none of his immediate family members was enrolled in a Choctaw tribe. On January 24, 2020, DCFS sent notice to the Bureau of Indian Affairs and three Choctaw tribes, and in February 2020, DCFS received responses stating Josiah T. was not eligible for enrollment in the Choctaw tribes.

DCFS filed an addendum to its section 366.26 report in March 2020. In this addendum, DCFS purported to recount all its ICWA efforts. It described in particular detail the efforts it had made to obtain responses from the Choctaw tribes and the Bureau of Indian Affairs. DCFS urged the court to rule that ICWA did not apply because Josiah T. and his brother were neither enrolled nor eligible for enrollment in a Choctaw tribe. But DCFS again omitted paternal grandmother's April 2019

14

disclosure of Cherokee ancestry through her maternal line, only mentioning her later denial of Indian ancestry.

DCFS filed two more addenda to its section 366.26 report because the section 366.26 hearing was continued several times. In both of these addenda, filed December 18, 2020, and February 16, 2021, DCFS failed to disclose paternal grandmother's April 2019 report of Cherokee ancestry and noted only that she had denied Indian ancestry in November 2019.

DCFS mentioned paternal grandmother's initial statement about her Cherokee ancestry only once more, in a status review report filed in September 2020 for a permanency planning review hearing pursuant to section 366.3.

On January 4, 2021, the juvenile court found it had no reason to know Josiah T. was an Indian child.

## DISCUSSION

Mother argues on appeal that the juvenile court erred in finding ICWA did not apply to Josiah T. because DCFS failed to satisfy its duty to inquire whether he was an Indian child under ICWA. "Where, as here, the juvenile court finds ICWA does not apply to a child, '[t]he finding implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry.' (*In re Austin J.* [(2020) 47 Cal.App.5th 870, 885 (*Austin J.*)]; see *In re D.S.* [(2020) 46 Cal.App.5th 1041, 1050 (*D.S.*)] ['[t]he juvenile court may . . . make a finding that ICWA does *not* apply because the Agency's further inquiry and due diligence was "proper and adequate" but no "reason to know" whether the child is an Indian child was discovered'].)" (*In re J.S.* (2021) 62 Cal.App.5th 678, 688.) " '[W]e review the juvenile

15

court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' " (*In re D.F.* (2020) 55 Cal.App.5th 558, 565 (*D.F.*).)

## I. *Applicable Law*

ICWA reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902; *Austin J.*, *supra*, 47 Cal.App.5th at p. 881.) To that end, ICWA established unique standards for the removal and placement of American Indian children. (25 U.S.C. § 1901 et seq.) Central to the protections of ICWA are procedural rules to determine whether an Indian child is involved. Federal regulations implementing ICWA require state courts to ask participants in child custody proceedings whether the participant knows or has reason to know the child is an Indian child. (25 C.F.R. § 23.107(a).) The court must also tell the parties to inform the court if the parties receive information giving them reason to know the child is an Indian child. (*Ibid.*)

The juvenile court has "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); *D.F.*, *supra*, 55 Cal.App.5th at p. 566.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*D.F.*, at p. 566.)

16

State law lays out the requirements for initial inquiry and further inquiry.  (*Austin J.*, *supra*, 47 Cal.App.5th at p. 883.)  Initial inquiry includes the following:  DCFS must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  At each participant's first appearance at dependency proceedings, the court must ask whether the participant knows or has reason to know the child is an Indian child.  (*Id.*, subd. (c).)

The court and DCFS social workers must make "further inquiry" if the court or DCFS has "reason to believe" an Indian child is involved.  (§ 224.2, subd. (e).)  "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe.  Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know [the child is an Indian child]."  (*Id.*, subd. (e)(1).)

The law lays out steps the court and DCFS must take in "further inquiry," including, but not limited to, interviewing parents and extended family members and notifying the Bureau of Indian Affairs and any tribes "that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (§ 224.2, subd. (e)(2)(A)–(C); see also Cal. Rules of Court, rule 5.481(a)(4).)  Contact with a tribe must include, at minimum, "telephone, facsimile, or electronic

17

mail contact to each tribe's designated agent" and information "necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(2)(C).)

A court's finding there is "reason to know" a child is an Indian child requires formal notice to the tribe. (§ 224.3; see also *D.F.*, *supra*, 55 Cal.App.5th at p. 568.) Sharing information with a tribe at the "further inquiry" stage is distinct from formal notice. (*D.F.*, at p. 567.)

II.    *Initial Duty of Inquiry*

In the present case, ICWA inquiry and determinations with respect to Father were virtually ignored until the permanency planning stage. For the first 18 months of Josiah T.'s case, DCFS proceeded as though its inability to locate Father excused it from the responsibility of ascertaining whether there was reason to believe Josiah T. is an Indian child. DCFS was not excused. In the course of its initial inquiry into Josiah T.'s possible Indian ancestry, DCFS was required by law to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) DCFS failed to do so in any timely manner. Obviously, Josiah T., an infant, was unable to provide information to DCFS, and to be sure, the record is replete with unsuccessful DCFS efforts to contact Father throughout the dependency case. But DCFS neglected to interview the four available paternal relatives in any reasonable timeframe to inquire whether Josiah T. has Indian ancestry.

Josiah T.'s case began in October 2017. DCFS knew paternal grandmother's name and address from the very start of the proceedings, and DCFS was in contact with her early in the

dependency case because she wanted her grandsons placed with her. Other paternal extended family members were known to and available to DCFS from the early days of the dependency matter: DCFS had encountered paternal uncle at the home of paternal grandmother, where he apparently lived, and DCFS had been scheduled to meet with paternal uncle in December 2017 when it was exploring placement of the children with paternal grandmother. There is no indication in the record that DCFS ever spoke to paternal uncle about ICWA. DCFS first spoke with paternal grandfather in April 2018, and it knew of paternal aunt by July 2018 at the latest. Both were cooperative with DCFS.

Despite having four paternal family members known to DCFS and potentially available to consult about American Indian ancestry, DCFS delayed all ICWA inquiry for a full 18 months after Josiah T.'s petition was filed. DCFS's *initial* inquiry under ICWA was not made until after the jurisdictional and dispositional hearings, the 6-month review hearing, and the 12-month review hearing. It was only three days before the scheduled date of the 18-month permanency review hearing—the point at which reunification services were terminated and the hearing for the termination of parental rights was set—that DCFS bothered to ask paternal grandmother, with whom social workers had long been in contact, about Indian ancestry. And asking paternal grandmother about her American Indian ancestry was all DCFS did. DCFS never consulted paternal uncle, and it waited seven more months, until November 2019, before inquiring with paternal aunt and paternal grandfather about ICWA—more than two years after the petition was filed. DCFS's belated initial inquiry was inadequate.

19

III.    *Duty to Further Inquire*

DCFS argues paternal grandmother's April 2019 statement that she had Cherokee ancestry did not trigger the duty of further inquiry because even though she identified her grandmother as the person with Cherokee heritage, she declined to provide information about her grandmother and denied having further information regarding Indian heritage.  We disagree.  Based on the representation by paternal grandmother that she had Cherokee ancestry through her grandmother, DCFS was required to engage in further inquiry.  The facts here are similar to those we considered in *D.F.*  In *D.F.*, the mother stated she might have Indian ancestry from an unnamed tribe in New Mexico.  (*D.F.*, *supra*, 55 Cal.App.5th at p. 569.)  DCFS argued, just as it does here, that this was insufficient to trigger a duty of further inquiry.  (*Ibid*.)  Observing that even though the mother in *D.F.* did not identify a specific tribe, she did specify it was a tribe from New Mexico, we found "this information [wa]s specific enough to trigger the duty of further inquiry."  (*Ibid*.; see also *D.S.*, *supra*, 46 Cal.App.5th at pp. 1046, 1052 [aunt's statement that she may have Sioux and Blackfeet ancestry but that she had no further information and had no reason to believe the child was an Indian child was "sufficient to establish a reason to believe" and "triggered a duty to conduct a further inquiry"].)  Similarly here, paternal grandmother's representation that she had Cherokee ancestry through her grandmother was specific enough to trigger the duty of further inquiry.  DCFS's initial inquiry created a "reason to believe" Josiah T. possibly is an Indian child.

At that point, DCFS had the duty to further inquire into Josiah T.'s possible Indian status as soon as practicable.  (§ 224.2, subd. (e) ["If the . . . social worker . . . has reason to believe that

20

an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the . . . social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable"].) "*Further inquiry* as to the possible Indian status of the child includes: (1) interviewing the parents and extended family members to gather required information; (2) contacting the Bureau of Indian Affairs and State Department of Social Services for assistance in identifying the tribes in which the child may be a member or eligible for membership in; and (3) contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership or eligibility." (*D.F.*, *supra*, 55 Cal.App.5th at pp. 566–567, fn. omitted.)

But DCFS did nothing about paternal grandmother's disclosure of Cherokee ancestry for seven months. There is no indication in the record that DCFS ever in the course of the dependency proceedings sought information about Father's maternal line from other available paternal relatives. Nor did DCFS ever reach out to the Bureau of Indian Affairs or the various Cherokee tribes to ascertain whether Josiah T. is a Cherokee child. "The burden is on the Agency to obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe or, if the tribe is unknown, to the [Bureau of Indian Affairs]." (*In re Louis S.* (2004) 117 Cal.App.4th 622, 630.)

From the record before us, it appears DCFS failed to fulfill its duty to engage in further inquiry as soon as practicable. (§ 224.2, subd. (e).) While DCFS's "inquiry obligation is 'not an absolute duty to ascertain or refute Native American ancestry,' "

21

(*D.F.*, *supra*, 55 Cal.App.5th at p. 570), failing to perform any inquiry whatsoever for seven months cannot be considered a timely, diligent, or good faith effort to gather information about Josiah T.'s membership status or eligibility. "[T]he social worker's affirmative duty to inquire whether the minors might be Indian children mandated, at a minimum, that she make some inquiry regarding the additional information required to be included in the ICWA notice." (*In re D.T.* (2003) 113 Cal.App.4th 1449, 1455.)

Although this would not excuse DCFS's inactivity for the seven months after paternal grandmother disclosed Cherokee ancestry to the social worker, DCFS argues that paternal grandmother's denial of Indian ancestry in November 2019 meant "there was no further duty on the part of the dependency investigator to pursue Josiah's possible Cherokee heritage." The law is to the contrary: a mere change in reporting, without more, is not an automatic ICWA free pass; when there is a conflict in the evidence and no supporting information, DCFS may not rely on the denial alone without making some effort to clarify the relative's claim. (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160 (*Gabriel G.*).)

*Gabriel G.* is instructive. There, the father initially claimed Cherokee ancestry but "the social worker interviewed father . . . and reported father stated that he did not have Indian heritage. But the social worker's representation in the Department's report did not provide any specifics regarding the inquiry he made of father as to his Indian heritage. For example, the social worker did not state whether he limited his inquiry to father's registration in a federally recognized tribe or inquired about the registration status of father's relatives. Nor did the social worker

22

state whether he specifically asked father to elaborate on the information [previously] provided in the ICWA-020 form or to explain any discrepancy between its contents and father's statement to the social worker.  On the record before us, we cannot discern whether father meant to convey that while he was not a registered member of a Cherokee tribe, his own father was registered.  [¶]  At a minimum, a conflict in the evidence exists.  Under these circumstances, the social worker had a duty of further inquiry.  [Citation.]  But there is nothing in the record to indicate the social worker interviewed anyone besides father, such as the paternal grandmother." (*Gabriel G., supra,* 206 Cal.App.5th at pp. 1167–1168.)

The same is true here.  The entirety of the report of paternal grandmother's denial of Indian ancestry reads "On 11/6/19, PGM LaTasha W[.] stated to DI Manfre that she does not have Native American heritage."  As in *Gabriel G.*, the "social worker's representation in the Department's report did not provide any specifics regarding the inquiry" she made of paternal grandmother as to her Indian heritage, and the record reflects no effort by the social worker to clarify paternal grandmother's claim.  Without further information about what was asked and what was said, we cannot agree the single-sentence, unexplained denial in November 2019 extinguished DCFS's reason to believe Josiah T. may be an Indian child.

IV.    *Failure to Disclose to the Court Information That Would Have Allowed the Court to Give Proper ICWA Direction and Make Informed Rulings*

California Rules of Court, rule 5.481(a)(5) provides, "The petitioner must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has

23

undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." DCFS has a duty "to document it[s inquiry] and to provide clear information to the court" so the court may rule on the question of whether the ICWA applies. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198 (*L.S.*).) DCFS did not inform the court in a timely fashion that paternal grandmother had disclosed Cherokee ancestry. Despite having promised the juvenile court it would file a last minute information report in April 2019 detailing the information it received from paternal grandmother, it did not do so. Instead, DCFS filed multiple reports for the remainder of 2019 in which it did not tell the court she had disclosed Cherokee ancestry, even as it asked the court to make ICWA findings.

Ultimately, DCFS withheld from the juvenile court paternal grandmother's disclosure of Cherokee ancestry until the following year. Only in January 2020 did DCFS relate the April 2019 conversation in a status review report. By that time, DCFS had performed only one act to follow up on paternal grandmother's report: Seven months after the initial disclosure, in November 2019, DCFS returned to paternal grandmother and made some inquiry about ICWA. This time, paternal grandmother answered she had no Indian ancestry. The record does not reflect that DCFS asked paternal grandmother to clarify why she had said she had Cherokee ancestry through her maternal grandmother, then months later denied any such ancestry. Nor does the record indicate that DCFS ever inquired with paternal aunt, paternal uncle, or paternal grandfather whether they knew of any Indian ancestry through paternal grandmother, or sought names, birthdates, and any other

24

information about paternal grandmother's relatives—even though DCFS spoke to paternal aunt and grandfather about ICWA on the same day paternal grandmother changed her account.[2] Instead, DCFS simply ignored paternal grandmother's initial statement in nearly every subsequent report, informing the court only of the later conversation in which she denied Indian ancestry.

In fact, although DCFS filed a section 366.26 report and three addenda (in November 2019, March 2020, December 2020, and February 2021), DCFS never included paternal grandmother's report of Cherokee ancestry in any of these documents, meaning that when the juvenile court consulted the section 366.26 reports for ICWA information, the court had no way of knowing the April 2019 conversation had ever happened. When the juvenile court ruled on ICWA applicability in January 2021, in order for the juvenile court to know paternal grandmother had claimed Cherokee ancestry it would have had to set aside the supposedly comprehensive section 366.26 report and recent addenda and look back at superseded status reports from the January 2020 or September 2020 review hearings. This violated the requirement of California Rules of Court, rule 5.481(a)(5) that DCFS "on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status." Particularly in a lengthy, complicated family matter such as this one, involving multiple petitions, separate

---

[2] The social worker's report discusses only paternal aunt and paternal grandfather's report of paternal grandfather's Choctaw heritage. It does not describe any inquiry with paternal aunt or grandfather about paternal grandmother's claim or ancestors.

cases, and several children with different alleged fathers, it is not reasonable to expect the juvenile court to check the operative section 366.26 permanency planning reports against all prior reports to make sure DCFS has provided complete summaries of its all its ICWA inquiries and information received. DCFS's omissions deprived the juvenile court of the information it needed to make informed rulings as to whether DCFS's inquiry was adequate and whether ICWA applied.

V.     *DCFS's Failures to Fulfill its ICWA Obligations and to Disclose Information to the Juvenile Court Undermine the Court's ICWA Ruling*

"The juvenile court may find ICWA does not apply following 'proper and adequate further inquiry and due diligence' by DCFS because 'there is no reason to know whether the child is an Indian child' or because 'the court does not have sufficient evidence to determine that the child is or is not an Indian child' " (*D.F.*, *supra*, 55 Cal.App.5th at pp. 570–571), but the court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a DCFS inquiry that is not proper, adequate, or demonstrative of due diligence. "In order for the court to make a determination whether the notice requirements of the ICWA have been satisfied, it must have sufficient facts, as established by the Agency, about the claims of the parents, the extent of the inquiry, the results of the inquiry, the notice provided any tribes and the responses of the tribes to the notices given. Without these facts, the juvenile court is unable to find, explicitly or implicitly, whether the ICWA applies." (*L.S.*, *supra*, 230 Cal.App.4th at p. 1198.) Because of DCFS's inquiry and reporting deficiencies, the juvenile court lacked the information it needed to make those determinations,

26

and even worse, it would have had to engage in detective work to uncover the fact that it did not have the information necessary to make an informed ruling. Under these circumstances, and through no fault of the juvenile court, we cannot conclude the evidence was sufficient to support the court's determination it had no reason to know Josiah T. is an Indian child.

The juvenile court must be provided with full information about DCFS's investigation so it may determine whether the investigation was adequate and whether there is reason to know Josiah T. is an Indian child. Accordingly, we conditionally reverse the order terminating parental rights and remand with directions to the juvenile court to permit DCFS to demonstrate it did in fact satisfy its affirmative duty to investigate. If DCFS shows its investigation fulfilled its duty to investigate, the court should reinstate its section 366.26 orders.

If DCFS is unable to demonstrate its investigation was adequate to satisfy its obligations, the court should order DCFS to perform an investigation consistent with the law and this decision. If as a result of that investigation new information is obtained that may assist the Bureau of Indian Affairs or a specific tribe or tribes in determining whether Josiah T. is an Indian child, the juvenile court shall order DCFS to provide the Bureau of Indian Affairs and any appropriate tribe or tribes with proper notice incorporating that additional information. If adequate additional investigation is performed but yields no further information that could assist the Bureau of Indian Affairs or a specific tribe or tribes in determining whether Josiah T. is an Indian child, the juvenile court shall reinstate its section 366.26 orders.

In the event that notice is ordered: If a tribe responds, indicates that Josiah T. is an Indian child, and seeks intervention, the juvenile court's orders shall be vacated and proceedings consistent with ICWA conducted. If no tribe responds that Josiah T. is an Indian child, or if no tribe seeks to intervene, the court should then reinstate its section 366.26 orders.

## DISPOSITION

The order terminating parental rights under section 366.26 is reversed and the matter is remanded to the juvenile court with directions that within 10 days of the remittitur DCFS demonstrate the scope and adequacy of its investigation of Josiah T.'s potential Indian ancestry. If the juvenile court determines DCFS's investigation satisfied its affirmative duty to investigate, the court shall reinstate its section 366.26 orders.

If the juvenile court concludes DCFS's investigation was insufficient, the juvenile court shall order, pursuant to ICWA and rules 5.481 and 5.482 of the California Rules of Court, that within 30 days of the remittitur DCFS perform a thorough investigation of Josiah T.'s potential Indian ancestry. If adequate additional investigation is performed but yields no further information that could assist the Bureau of Indian Affairs or a specific tribe or tribes in determining whether Josiah T. is an Indian child, the juvenile court shall then reinstate its section 366.26 orders. If as a result of that investigation new information has been obtained that may assist the Bureau of Indian Affairs or a specific tribe or tribes in determining whether Josiah T. is an Indian child, the juvenile court shall order DCFS to provide the appropriate tribe or tribes and the Bureau of

Indian Affairs with proper notice of the pending proceedings, which should include all relevant family members' names, birth dates, and places of birth, as well as the required forms and a copy of the petition; and that DCFS file copies of the notices sent, all return receipts, and all responses received with the juvenile court.

In the event new notice is given and no tribe responds indicating Josiah T. is an Indian child within the meaning of ICWA, or no tribe seeks to intervene, the court shall reinstate its orders. If a tribe determines Josiah T. is an Indian child and seeks to intervene in the juvenile court proceedings, the juvenile court shall vacate its prior orders and conduct all proceedings in accordance with ICWA and related California law.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.

29